Case number 19-5691, William Allen v. Candice Batts, et al. Order largeness not to exceed 15 minutes per side. Mr. Camp for the appellant. You may proceed. Thank you. Good morning, Your Honors. My name is Sumter Camp. I work in the office of the Federal Public Defender in the Middle District of Tennessee and represent Mr. Allen in this 254. petition. I would like to reserve three minutes for rebuttal. It is our position that the 1973 ruling by the Tennessee Court of Criminal Appeals was unreasonable and the district court erred in finding otherwise. This involves a grand jury discrimination claim filed by Mr. Allen at the time of his trial. The elements of that claim were a selection system that was susceptible to abuse and proof of discrimination, the workings of that system. One method that could be used for proof of discrimination is the rule of exclusion. The district court in its order noted the rule of exclusion was not specifically adopted by the Supreme Court until 1977 in Castaneda v. Partita. That's incorrect as the state has conceded in its brief. Hernandez v. Texas in 1954 stated, this holding sometimes called the rule of exclusion has been applied in other cases and is available in supplying proof of discrimination against any delineated class. This was therefore error on the Mr. Camp? Yes. Mr. Camp, this is Judge Radler. Yes, so one of the unique things about this case is that our court has already decided these issues and I read the subsequent lines of cases that have come since then to say we have the ability potentially to issue a new opinion that disagrees with the prior panel, but why would we, why would this panel substitute its judgment for a panel of this same court that's already decided these issues? There's no new law that we can consider, whether that's by which actually probably cuts against your client, but there's no new law or facts we can consider. So why would we, why would we do it? Judge, it's, it's frankly our position that Jefferson v. Morgan does dictate the outcome here. Well, yes, but our, our, our court already decided, I wasn't focusing so much specifically, well, so Jefferson is our case from 1982? Yes. Okay, so I have two thoughts about that. One is that I don't know why we would, I don't know why we would look to a panel of this court that decided a different case as opposed to a panel of this court that decided this exact same case. And then our 1982 decision relied on two Supreme Court decisions that came after our 1974 decision, and more importantly, after the Tennessee state courts had a chance to review these issues, Castaneda and Rose. So I don't think we can consider Castaneda and Rose, and those are the two cases that were pivotal to our 1982 decision. Yes, but I think in, in Jefferson and I think in Jefferson, what's important is that this court found, as a matter of fact and law, that the key man system employed in Davidson County, Tennessee, at that time, was susceptible to abuse and that discrimination had occurred, did occur, in the use of that system. But we've had the opposite in our Allen case in 1974, in this exact same case, the same facts. So you're asking us to revert, I mean, you're asking us to second guess the decision we've already issued, which is quite unusual. I have to say, I don't know if you have authority for that, but it's quite an unusual situation. Yes, sir, I'm not sure I've come across a case in which there were two separate cases that dealt with the same issue and came to different ends. You know, and I guess at this point, I guess I, go ahead, go ahead, Judge Moore, go ahead. I was going to ask whether the state had relied on the law of the case doctrine in its briefing in front of us. No, ma'am, I don't believe so. But couldn't, couldn't it be, counsel, it doesn't have to be necessarily a formal application of law of the case, but just a pragmatic and practical, yes, we have the authority to do it, but why wouldn't we do it? I just don't understand that. And, you know, there's a footnote in the Supreme Court's MAGWA decision that talks about this very idea, where it's responding to the dissent, where the dissent says this rule is going to allow courts to just reconsider issues they've already decided. And the majority are pretty dismissive of that idea and said it will not take a court long to dispose of claims where the court has already analyzed the legal issues. In other words, perfunctory, if the court's already decided it, they're surely just going to do the same thing. That's what MAGWA clearly forecasts. And that's exactly what you're asking us to do here. Granted, there's been 50 years intervening, but for other purposes, everything's frozen. So I don't think that matters. But anyway, I'll stop. That's just really the threshold concern I had. In light of Judge Raebler's concern, why don't you address what is wrong with the 1974 Sixth Circuit decision? Yes, ma'am. I'll do that. Let me skip forward that. I think we just lost someone. If you could hold on just a second. Marshall? I'm not sure who we lost. I'm here. Just show everyone's on the line still. This is Mr. Camp on the line. We lost Leon. Back up. Okay. Don't bring him back. Okay. Just go ahead. I'm sorry. As long as the panel's ready, you can proceed, counsel. All right. And Mr. Bledsoe is there as well. Yes, Mr. Bledsoe, you're there. Okay, great. So we have the three judges and the two counsel, and Mr. Camp, you can continue now. We won't hold this time against you. And please address what's wrong with the 1974 Sixth Circuit decision. Yes, ma'am. Yeah. It's our position that Mr. Allen established the elements of his claim, first by showing that the key man system was susceptible of abuse, which Jefferson recognizes. Secondly, that the rule of exclusion in his case established discrimination. Setting aside for the moment the quibble about the judge's testimony in the case, it's our position that the rule of exclusion was satisfied separately and independently by the Gibbons order, which the trial court took judicial notice of, and there had been an earlier stipulation in Mr. Allen's case with the district attorney in the Gibbons case about the numbers and grand jury representation. And that was that there were eight African American grand jurors out of the 338 grand jurors between September 1958 and March of 1967, which would be 2.4% or a 17.5% disparity from the 19.9% African American population. By ignoring that order, it is our position that the Court of Criminal Appeals, which acknowledged the Gibbons order, and the district court, which also acknowledged it and mentioned it in its opinion, including the facts therein, were wrong and, in fact, were unreasonable. It is also our position- Mr. Camp, this is Judge McKee. Let's assume for a second that the Gibbons order does count and shouldn't have been ignored. And let's even assume for a second that in terms of trying to establish a prima facie case here, that there is sufficient evidence here, even though the Tennessee court described it as speculative. Let's just assume for a minute, if you would, that there is sufficient evidence of this statistical disparity. It seems to me that reading all the cases up to this time in 1972, that all the Supreme Court cases had focused on cases where there was not only a complete exclusion of African Americans, but in addition to that, you could point to a discrete point in the process that either did result in the complete exclusion or had real potential to result in that exclusion. So assuming for a second that my hypothetical is right, then this wasn't a case of complete exclusion, correct? Correct. And number two, what is the discrete point that the Supreme Court seems to be talking about in these other cases that have a, all these other cases have a system, and then there were one or more points within the system that resulted in the complete exclusion. Here it doesn't seem like there was a system like the type of system that was described in the other cases. So could you give me your thoughts on that, please? Yes, sir. First, I don't think it has to be complete exclusion in order to underrepresent the participation of a minority group or any particular group in it. Secondly, I think what the court, what the Supreme Court described as a process that what it was looking at was whether or not the system was susceptible to abuse. In other words, and as we've set out in our brief, you know, if you were just blindly picking names out of a hat, it doesn't matter what your discriminatory intent was if there's no way that that intention can cause a disparity. However, with the key man system where the judges were the sole word in who did or did not get on the grand jury, one of the judges talked about meeting with the potential members before putting them on the grand jury. That is a system that is susceptible to abuse, and the numbers sustain that. The 17.5 percent disparity falls in between the disparities noted by the Supreme Court in Jones v. Georgia, which was 14.7 percent, and Sims v. Georgia, which was 19.7 percent. Mr. Allen, 17.5 percent, although it may not represent a total exclusion, still represents a dramatic exclusion of African Americans from the grand jury process in Davidson County. So, other than Alexander, what do you think is the best case for you that essentially, I would respectfully suggest that you're tying together a number of concepts in prior Supreme Court decisions, which we can't do. So, what's the best case that actually expresses what you just said? Well, I think Hernandez v. Texas would be one. I think Alexander would be another. I don't have the brief in front of me at the moment, but I believe we have set out those cases in the brief that we believe support our position about this. I would respectfully disagree with your honor that we're tying together disparate elements from different cases. I think an overview of the Supreme Court's cases is clear that that's what the court is looking for. I think it was so because early on, yes, discrimination was very clear and more obvious than it became later. And so, if you look at is the process susceptible to abuse and at what point, then you go to, you know, even if you have a system that's susceptible to abuse, if you look at the rule of exclusion and there's only a 2% disparity, you might say, okay, that's not discriminatory. But where you look at a system such as the key man system that is susceptible to abuse and you find a 17.5% disparity, then you can say despite what judges, judicial commissioners, or whatever might say about their intent, this establishes a prima facie case of discrimination. All right. If I might just take up one more moment here, this is an interesting case, I think, in many respects, but one of them is that there was not a compulsory system here. This was essentially a voluntary system where judges called people up and tried to get them to serve on the grand jury. Have you been able to find a case that has one of these key man systems in a non-compulsory grand jury selection case where because the numbers seem to be out of whack, the mere fact the numbers being out of whack and there's a non-compulsory system, had the Supreme Court ever addressed that? Frankly, Your Honor, I don't know. I have not looked at that. I think our position would be that whether or not the system was compulsory would not affect the calculus that I've just described. That, in fact, I believe the testimony of one of the judges was that they could have compelled the grand jurors to serve. They simply chose not to. Well, if you're relying upon Hernandez, that was the complete exclusion case from 1954. So I'm just trying to figure out, I think there are really good arguments on both sides. I don't mean to suggest otherwise, but I'm just trying to figure out if there are really good arguments on both sides as to whether the Supreme Court had really gotten to this. If there are good arguments on both sides, then how can the Tennessee decision have been held to be not only contrary to and an unreasonable application of, but in a way that not only was just wrong, but also was unreasonably wrong, which is the high standard that AEDPA imposes? Yes, and I think the answer to that goes to what I said about givens. What the Tennessee Court of Criminal Appeals based its ruling on was the failure to prove discrimination and not the possibility of discrimination. And that's where we get into the Court of Criminal Appeals referring to the judge's testimony as mere speculation or vague recollection, while at the same time ignoring the That's what the court focused on. They didn't talk about whether or not it was a compulsory system or whether there was complete exclusion. The court seemed to accept that that could be, but instead decided that what was lacking was the proof. And on that, it is our position that that was an unreasonable decision given the givens proof. And I would say if you look at the judge's testimony, one, it was not mere speculation or vague recollection. They were very clear going name by name. But secondly, the givens order confirms what the judge has testified to. And so that, I would suggest, makes the Tennessee Court of Criminal Appeals opinion unreasonable in that they ignored those facts to come to their conclusion. And that in doing so, they ignored clearly established Supreme Court precedent establishing that the rule of exclusion establishes a prima facie case of discrimination, certainly in cases where you've shown a 17.5% disparity. Thank you very much. I think unless there's another question, your time has expired. Thank you. Mr. Bledsoe? Mr. Bledsoe, are you there? Mr. Bledsoe? I apologize, Your Honor. I inadvertently hit mute. Sure. I do apologize. May it please the Court, John Bledsoe on behalf of the respondent in this habeas corpus appeal from the dismissal of the petitioner's petition regarding one of his first-degree murder convictions arising from this criminal offense. The particular issue, which I realized from the counsel's argument and the Court's questions, I think it's pretty well laid out. Edpedeference applies to how the State Court of Criminal Appeals resolved the constitutional claim. And that involves looking to what the clearly established federal law was at that time, as stated by the Supreme Court. We have unique procedural history and facts here for a number of reasons, one of them being, as was highlighted, that the Court has already reviewed this claim under the same record and under the same law. Now the Court is reviewing it under a more deferential view, so I'll try to tether my argument to that and whether specifically the State Court's decision was contrary to our unreasonable application of federal law at that time. And I think the answer to that is twofold. One's more legal, one's more factual. On the legal side, what the petitioner has consistently argued all along boils down to does a statistical disparity alone state a prima facie case? And in terms of EDPA, must the Court of Criminal Appeals have concluded under Supreme Court precedent at that time that the statistical disparity alone established it? And our simple response to that is no. As the district court accurately noted, all of the cases on which the petitioner relied on were sort of the flip side of what we have here. They were cases where individual jurors were called out at some point in the process. And so there was an inquiry, because ultimately we're looking to whether there was systematic exclusion based upon race, is where in that process that it happened. And when you had such a stark statistical difference, that may state a prima facie case. But looking at Alexander specifically, because that was the most recent case that the Supreme Court had decided. And it's one that the petitioner relied on heavily in their briefing to the Court of Criminal Appeals, and rely on still in this case. But in Alexander, now that was a calling case. It was sort of the opposite of this. But still, the court declined to find a prima facie case based upon the statistical disparity alone. It recognized that the court had not at that time announced a particular mathematical standard for stating the prima facie case. And it said that a factual inquiry is necessary in each case that takes into account all possible explanatory factors. I submit that that's what the Court of Criminal Appeals actually did here, albeit in a case that is a flip flop. Now, I actually think the cases can be resolved solely on the basis that there was no Supreme Court precedent up to this point that addressed a system like this, where you had individual judges covering a term who were essentially going out and finding individuals to serve. Where I think that matters. Counsel, this is Judge Radler. What about Castle v. State of Texas? Your Honor, I can't speak to exactly what that particular one says, just the case name. I apologize. Okay. I apologize. I guess what I'm saying here is that in those other cases, they're looking to where there's a statistical difference. And you do not thwart a prima facie showing by representations by the deciders that they did not take race into account. But here, they were taking race into account, as they were taking class, gender, age, and you had testimony in the record. My point in terms of epidefference is that the court had not squarely been presented with this situation, or as the district court characterized it. It had not, all of the other cases had involved that calling, and not specifically this scenario. So in terms of epidefference, it doesn't rise to the level of being an unreasonable application. And that's, I think that ends that inquiry. You had Carter, which had been decided a short time before. Now, that was a civil case, a challenge to a system, and the court rejected a facial challenge there. But the court recognized that there are legitimate reasons for having a system, and every system has to have this, where there are certain questions asked. There's a certain looking to the qualifications, citizenship, residency, age, legitimate consideration. So having a system, the court, the point here is the court had not squarely determined that having this kind of system was in and of itself unconstitutional. And with Alexander, we know that the statistical disparity alone did not compel the Court of Criminal Appeals to conclude under Supreme Court precedent that that alone stated the case. What the court did was consider all of the proof presented. And that this could- Doesn't Alexander, this is Judge Moore. Doesn't Alexander suggest that one should consider the substantial disparity, i.e. the statistical evidence alongside evidence that the selection procedures themselves were not racially neutral? Your Honor, I think what Alexander is saying is you look to the statistical disparity, and then you look to the system that led to it. My point is- And then Alexander went on to say that selection procedures are not racially neutral when they provide a clear and easy opportunity for racial discrimination. And why isn't that involved in this exact system? Because in this system- Well, you have the testimony showing the explanation for the disparity. And then you have Alexander saying that you don't take into- Affirmations of good faith in making individual selections are insufficient to dispel a prima facie case of systematic exclusion. Right, Your Honor. It's not just their good faith. It's the testimony presenting to explain the factors that led to the difficulties they had in selecting jurors, the way the jury system works, the four-month commitment, the impact it had on individuals and their working ability. I mean, you have proof added that explains it. It's not just their good faith. It is that evidence- Mr. Bledsoe, this is McKeague. Alexander is a culling case. So I think you can read Alexander more broadly, but at its heart, it's a culling case. So in this particular instance, once at least one of these judges said- This is an opposite case from what we see, because if the judges are to be believed, they were actually going out looking for African-Americans to achieve this fair and balanced system. Now, granted, maybe you don't believe them based on what the statistical result of that process was, but they said they were trying to get African-Americans, and it was more difficult to get them in a voluntary system to serve. I just want to make sure that I didn't miss anything here. Did Alan in any way try to refute those assertions by the judges in that evidentiary hearing that was held, aside from saying what the numbers that resulted from that system were? No, Your Honor. In the hearing, the way it was tried was interesting, because it was the petitioner who put forward all of this evidence and put forward the testimony of the judges, and it lifted testimony regarding their efforts. But the petitioner's argument, indeed looking to the closing argument at the end of that very hearing, was that that did not matter. That did not inform the prima facie case analysis. My point is simply, the Supreme Court precedent in existence at that time did not preclude a reasonable application of precedent that would authorize consideration of the entire record. Because, again, ultimately we're looking to a finding of systematic exclusion, and you have testimony. Well, first of all, there wasn't systematic exclusion. African-Americans had been at lower numbers. There's the statistical disparity that was offered. But you also had evidence as to the process and how that worked. You also had evidence about how substitute jurors were selected from pettit jurors. But if you're ultimately looking to whether there's been actual systemic exclusion, that's difficult to establish under this record, under the state of the law at that time where the Supreme Court had not directly addressed a system quite like this. And I think that ultimately is the issue that is fatal to the petitioner's argument. I mean, the court without that deference reached the same conclusion, but with the deference added in and focusing at that point in time in the state of the case law that the petitioner can't meet the burden. I would just briefly mention regarding the factual issue, and counsel mentioned the Givens order. The Court of Criminal Appeals ultimately concluded that the order, the trial court's taking judicial notice of the order that included a stipulation regarding certain disparity was before it. The Court of Criminal Appeals had it before it. It considered the entirety of the evidence when it made its decision. It rightly highlighted kind of the unique way the petitioner went about establishing the proof by not investigating before the hearing from the jury list, but just kind of asking the judges in the moment based upon recollection. You even at one point have a discussion between the district attorney general and one of the judges because their memories are different about a particular juror. So you did have that factual issue, which was a big issue for the Court of Criminal Appeals, but ultimately it was resolving the legal issue under the law at the time, and our position is it does not offend at the deference. He cannot show the decision was contrary to or an unreasonable application of Supreme Court precedent at that time. And unless the court has further questions, we ask the court to affirm. I'd just like to ask one more question that will illustrate my lack of familiarity with how grand juries work, maybe in general or at least in particular in Tennessee. There's a suggestion in some places in these arguments that presenting these judges with this list the day of the hearing and then asking them to go down the list and address which names on the list in their recollection were African American and were not was an acceptable way to proceed to establish these numbers because the judges had actually worked with these grand jurors, and I think it said for a period of four months or something like that. The way the grand jury works, is there really any day-in, day-out involvement with the judges other than being called in to referee some sort of a problem that arises? Or put another way, does the judges' involvement with who the grand jurors are and what their names are and what their rates are essentially end when they're selected? You know, Your Honor, I'm not sure I can speak with certainty on that. Obviously, the judges aren't in the grand jury room hearing the cases with them as part of that. I think the reason was more because they were making the decision. And it really all comes down to a quality of the proof, the credibility of the memory, not that they were being evasive or anything. It's just it's based upon memory, and they were given no kind of advanced heads up or review of the list to kind of search their memory better. I mean, it really just goes to the quality of it. But no, in terms of the day-to-day work, the judge isn't going to be directly involved, I don't believe, my understanding of it, unless there is some sort of dispute or something of that nature that involves the judge interacting with the grand jurors. So they were essentially being asked what their recollection was based on names on a list going back as long as 13 years. Right. And their addresses. In fact, the petitioner's counsel at the time attempted unsuccessfully to have the court sort of take judicial notice of the race of the listed individuals based on their addresses. That was rejected. Because the list was gathered by the clerk, and all the clerk had was the name and address, which he was given in order to pay the jurors for their service. He was given that list by the judges individually at the beginning of each term. So I really, our point there, and it was really a big issue for the Court of Criminal Appeals, is it was just a very odd, indirect way to prove facts. And it was done when the petitioner didn't believe it mattered anyway, because the petitioner's position was that the statistical imbalance, which the petitioner then and now was all that was necessary to show a promiscuous case. But again, our position is that it doesn't satisfy a pedeference either way. Okay. And just one question further on that. The judges, they were testifying at a hearing, is that right? They were, Your Honor. Two of them were. Yeah. And the third one was the judge involved in this case, is that right? He was. That's correct. Okay. So the two judges who were testifying at the hearing, they knew they were going to be at the hearing, right? I'm, you know, I'm not sure if the record, they probably did, but I'm not sure if the record clarifies that. It would be odd if people didn't know they were going to be testifying, but. Exactly. I don't disagree with that at all. You would presume that they would know what the issue was involved in front of them. Yes, Your Honor. Yes, I think that's fair. But you also, this is my read of the transcript, and I can't say this for certain, but it appeared to me reviewing the transcript that the clerk had only recently gotten the subpoena to gather the records. They were still gathering the names and the records while the clerk was testifying. He was the first witness. And eventually they got it completed before he ended testifying, but it was rather a last-minute gathering of information, and then the judges were asked at that time when they were each brought in to testify. I see your time is up. If any judge has a question otherwise, I think we'll thank you for your argument and have rebuttal. Thank you. Yes, Your Honor. I would first like to address a point that my colleague made there at the end, which was that it was our position that all we needed to establish our claim were the numbers. That's not our position. As I noted at the beginning of my presentation, there are two elements here, the first of those being a system that is subject to abuse. And then secondly, that system has been abused, and at that point the numbers come into play. And I submit that we have done that. I... Judge McKee, to your question about the judges believe they were trying to get a fair number of African Americans or whomever on the jury, I think in terms of our claim, that's refuted by their testimony, both about the extent of their discretion, which was full in terms of who was allowed on or not. And then secondly, I believe it was Judge Cornelius who mentioned the fact that he was limited by his social connections as to who he could call. And to that point, I think Smith v. Texas is applicable when the jury commissioners there had testified that they selected people from their own personal acquaintance, and the Supreme Court said that discrimination can arise from commissioners who know no Negroes as well as from commissioners who know but eliminate them. And I think... Well, I mean, that's undoubtedly true, but if you look at Smith v. Texas, that's also a case to where once you got down to being in the final cut, they assigned all the African Americans to numbers 13 through 16 when you're picking a 12-member grand jury. So, I mean, it seems to me we have to figure out, I think you're fairly quoting the language from that case. But when you put it in the context of the case, there was this discrete action that took place that singled out Blacks and excluded them. And I'm just trying to figure out, in terms of the application of Smith, based on the facts of Smith, whether there was any discrete action like that that took place in the selection of this grand jury. Judge, I think... I guess our position would be to that. What's important for AEDPA review is the holding of the court, and that holding of the court, part of that holding was that discrimination can happen just because you don't know somebody to put on the jury. And that's what Judge Cornelius testified to. He testified that he went to literally drawing names out of a hat to avoid the problems that had been described in Mr. Allen's claim. And I believe that my time is up, and I will yield. Yes. Any further questions from the judges? In that case, we thank both of you for your argument, and the case will be submitted, and you may disconnect from the call. Thank you both. Thank you all. Thank you.